# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

DARIN ELLIOTT HAIZEL,

                    Petitioner,

v.

WARDEN MICHAEL MEISNER,

                    Respondent.

Case No. 14-CV-1414-JPS

ORDER

Before the Court is Darin Elliott Haizel's petition for a writ of habeas corpus. (Docket #1). That petition is fully briefed (Docket #25, #28, #29), and the Court has reviewed the extensive record of Mr. Haizel's underlying state court proceedings (*see, e.g.*, Docket #8, #17, #18, #22).

Accordingly, the matter is ripe for resolution. The Court begins by providing background about Mr. Haizel's underlying state court conviction. It will then analyze each of Mr. Haizel's claims for relief.

1.     BACKGROUND

    1.1    The Facts Underlying Mr. Haizel's Conviction

On March 19, 2010, Mr. Haizel picked up beer and liquor after he left work and began drinking when he got home. (Docket #19 at 2).[1] Mr. Haizel listened to talk radio and later complained to his wife about the proposed passage of President Obama's healthcare plan. (*See id.* at 2–3). Mr. Haizel told his wife that he believed they may need to start stockpiling food. (*Id.*) He continued drinking, though, and his behavior became more erratic

---

[1]The Wisconsin Court of Appeals provided a limited discussion of the facts underlying Mr. Haizel's arrest and conviction. *See State v. Haizel*, 2013 WI App 138, ¶¶ 2-3, 351 Wis. 2d 683, 840 N.W.2d 138. The Court will fill in the gaps in the facts by referencing the presentence report, which has been filed under seal in this case. (Docket #19). In the state proceedings, Mr. Haizel disputed portions of that report, so the Court will reference only undisputed facts unless otherwise noted.

throughout the night. (*Id.*) At one point, he expressed concern that he had not had his children baptized and sung a song that included the lyrics "I will see you in heaven." (*Id.* at 3). He then told his wife that he was going to use the restroom and asked his wife to bring the children to the garage. (*Id.*) His wife, however, did not see him go to the restroom. (*Id.*) Instead, she saw him in a bedroom, where he was loading an ammunition clip and holding a gun in his waistband. (*Id.*) This prompted Mr. Haizel's wife to take the children and leave the house. (*See id.* at 2).

Shortly after leaving the house, Mr. Haizel's wife flagged down a Washington County Sheriff's Department deputy who passed her car on the road. (*Id.*) Mr. Haizel's wife explained that she believed that Mr. Haizel was intoxicated, armed, and potentially suicidal. (*Id.*) She also told the deputy that she had called Mr. Haizel's parents and requested that they go to the house and speak with Mr. Haizel. (*Id.* at 3).

Simultaneously, the deputy notified dispatch of the situation, eight total deputies reported to and set up a perimeter around Mr. Haizel's house while Mr. Haizel's parents were inside. (*See id.*) A lieutenant who was also on the scene called Mr. Haizel and told him to come out of the house. (*Id.*) Mr. Haizel made the lieutenant believe that he would shortly be leaving the residence with his parents. (*Id.*)

Shortly thereafter, Mr. Haizel's parents exited the house. (*Id.*) His mother came out first, followed by his father, who was carrying a gun with him. (*Id.*) Mr. Haizel, however, did not exit. (*Id.*)

Accordingly, one of the deputies on scene—Deputy Kiley—approached the house and looked through a window. (*Id.*) Deputy Killey observed that Mr. Haizel was still in the house and was, in fact,

retrieving another gun (an assault rifle). (*Id.*) Deputy Killey next saw the defendant walking through the residence holding the assault rifle and "clearing" rooms in a what Deputy Killey believed looked like a "tactical" manner. (*Id.*) Sensing danger, Deputy Killey moved away from the house and told the other law enforcement officers on the scene that Mr. Haizel was again armed. (*Id.*)

After Deputy Killey had moved away from the house, the officer heard a single gunshot from inside the house. (*Id.*) The officers did not take any further action at that time, because they were notified that Mr. Haizel was on the phone with his wife. (*Id.*) Five minutes later, the deputies heard approximately 19 shots from inside the house. (*Id.* at 4) They also heard the sound of breaking glass, leading them to believe that Mr. Haizel was shooting out the windows of his house. (*Id.*) Two minutes later, the deputies heard 6 more shots and the sound of more breaking glass. (*Id.*) Shortly thereafter, Deputy Killey observed a "direct muzzle flash" in one of the house's windows and, believing he was under fire, took cover behind a tree. (*Id.*)

Presumably during the short time that Deputy Killey took cover, Mr. Haizel jumped out of a window and ran away from his house. (*Id.*) He attempted to enter a neighbor's house before heading back toward his own. (*Id.*)

Meanwhile, another deputy on scene—Deputy Stolz—took a position on the south side of Mr. Haizel's residence, near a wooded area. (*Id.*) Deputy Stolz heard someone approaching his position slowly and assumed it was Mr. Haizel. (*Id.*) Deputy Stolz planned to arrest the approaching person by surprise, but Deputy Stolz accidentally bumped the light on his weapon, giving away his position. (*Id.*) His position revealed, Deputy Stolz turned on

his light, pointed his gun at the approaching person (revealed to be Mr. Haizel), and demanded that Mr. Haizel submit to arrest. (*Id.*)

Mr. Haizel, however, allegedly did not comply.[2] (*Id.*) Deputy Stolz later reported that he saw Mr. Haizel pull a handgun from his waist and, in spite of an order to drop the weapon, point the handgun at deputy Stolz. (*Id.*) Mr. Haizel then allegedly fired the gun at Deputy Stolz,[3] after which Deputy Stolz returned fire. (*Id.*) By that time, another deputy had made his way to the area, and also fired several shots at Mr. Haizel. (*Id.*) At least two bullets struck Mr. Haizel (*see id.* at 5), causing Mr. Haizel to slip down an embankment (*see id.* at 4). Deputy Stolz and others followed Mr. Haizel down the embankment, and eventually Mr. Haizel relinquished control of his handgun. (*Id.* at 5).

The deputies then arrested Mr. Haizel and had him transported to a hospital, where his gunshot wounds could be treated. (*Id.*) Mr. Haizel had a bullet wound to his left shoulder, his left forearm, and his left index finger was severely damaged. (*Id.*) A blood draw taken at the hospital revealed that Mr. Haizel had a .243 BAC. (*Id.*)

After Mr. Haizel was transported to the hospital, the on-scene officers searched Mr. Haizel's house. (*Id.*) They found shell casings to indicate that

---

[2]As the Court will discuss further, Mr. Haizel disputes several significant portions of Deputy Stolz's version of events. Mr. Haizel acknowledged that he could not remember most of the night's events due to his intoxication (Docket #19 at 6), but—after being sentenced—procured an expert report that he believes casts doubt on Deputy Stolz's version of events (*see* Docket #8, Ex. 2 at 48–49).

[3]This is now an issue. Mr. Haizel procured an investigative report from a forensic consultant, which says that it is unlikely that Mr. Haizel fired at Deputy Stolz. (Docket #8, Ex. 2, App. 11–12). Furthermore, a detective's report following the incident revealed that the police officers had not found shell casings from Mr. Haizel's handgun outside. *Haizel,* 2013 WI App 138 ¶¶ 3, 17.

Mr. Haizel had fired twelve .45 caliber rounds and nineteen 7.62 mm. rounds in the house. (*Id.*) They also found multiple other guns and rounds in the house, along with evidence that Mr. Haizel had drank quite a bit of alcohol. (*Id.*)

## 1.2 Pre-Plea Process

As the Court will discuss further, Mr. Haizel ultimately pled guilty to two charges of reckless endangerment. Several important events preceded his plea.

### 1.2.1 Complaint Against Mr. Haizel

On the basis of Mr. Haizel's actions, the Washington County District Attorney charged Mr. Haizel with five separate crimes:

Count 1: Attempt First Degree Intentional Homicide, in violation of Wis. Stat. §§ 940.01(1)(a), 939.50(3)(a), and 939.32, which carried a statutory maximum term of imprisonment of 60 years;

Count 2: First Degree Reckless Endangerment, Use of a Dangerous Weapon, in violation of Wis. Stat. §§ 941.30(1), 939.50(3)(f), and 939.62(1)(b), which carried a statutory maximum term of imprisonment of 12 years and 6 months;

Count 3: First Degree Reckless Endangerment, Use of a Dangerous Weapon, in violation of Wis. Stat. §§ 941.30(1), 939.50(3)(f), and 939.62(1)(b), which carried a statutory maximum term of imprisonment of 12 years and 6 months;

Count 4: First Degree Reckless Endangerment, Use of a Dangerous Weapon, in violation of Wis. Stat. §§ 941.30(1), 939.50(3)(f), and 939.62(1)(b), which carried a statutory maximum term of imprisonment of 12 years and 6 months; and

Count 5:     Intentionally Point Firearm—Law Enforcement Officer, in violation of Wis. Stat. §§ 941.20(1m)(b) and 939.50(3)(h), which carried a statutory maximum term of imprisonment of 6 years.

(*See* Docket #17, Ex. 9).[4]

### 1.2.2   Mr. Haizel's First Motion to Dismiss Certain Charges

On April 30, 2010, approximately one month after being charged, Mr. Haizel moved to dismiss the reckless endangerment charges. (Docket #17, Ex. 1). Through his attorney, Bridget Boyle, Mr. Haizel argued that the charges against him lacked specificity. (*Id.* at 2). In particular, Mr. Haizel was concerned that the reckless endangerment charges failed to set forth the specific conduct on which each rested: none of the three charges listed a specific victim or series of shots, for instance, as a basis. (*See id.* at 2–3).

### 1.2.3   Mr. Haizel's Preliminary Hearing

Several days later, Mr. Haizel appeared for a preliminary hearing,[5] where he raised these same arguments. (Docket #17, Ex. 2). The district attorney responded that the complaint against Mr. Haizel was sufficiently specific:

> the allegations in the complaint indicated that 12-plus shots with a .45 caliber semi-automatic handgun were fired from the residence, and 19-plus shots were fired from the residence using a high-powered semi-automatic assault rifle.… I feel we could have charged many more counts of first degree reckless

---

[4]The Court will hereinafter refer to Count 1 as the "attempted homicide charge"; counts 2, 3 and 4 as the "reckless endangerment charges"; and Count 5 as the "intentionally point firearm charge."

[5]Technically, Mr. Haizel waived his preliminary hearing, but the Court will nonetheless refer to this hearing as a "preliminary hearing," because it served the purpose of evaluating probable cause for the complaint against Mr. Haizel and occurred at a time similar to when Mr. Haizel might typically have received a preliminary hearing.

endangerment. I think, technically, we could have charged one for every shot the defendant fired from that residence.…

According to the defendant's father…he told the defendant, "Why would you want to shoot police officers? They have families just like you." Now, a reasonable inference from that statement is that the defendant just said to his dad that he was going to shoot the police officers.

He knew the police had surrounded the residence when he started shooting out of the residence.… I think a reasonable inference from the allegations of the complaint is the defendant would have shot any person, officer or not, inside that residence.

Now seeing none in the residence, he saw no police officers in the residence, he's looking out the back window…of the residence and he starts shooting dozens of times out of the residence, out windows, through walls. Shooting bullets out of the residence, which he knows is surrounded by police.…

He shot several rounds out the east window of the residence, he chose to shoot at least three rounds out the south side of the residence in the direction of the next-door neighbor's occupied home, and he chose to fire out the west wall of the residence. Rounds came out of that, that west wall of the residence a few feet off the ground. And they came out of the residence in an area where officers had been stationed.

(*Id.* at 4:14–7:3). Mr. Haizel disputed the district attorney's argument, maintaining that the complaint lacked specificity, because it failed to identify what conduct each separate reckless endangerment was based upon. (*Id.* at 7:19–9:22).

The Washington County Circuit Court ("the Circuit Court") recognized some merit in Mr. Haizel's position. (*Id.* at 10:7–11:3). For instance, the Circuit Court noted that, if the charges were to proceed to a jury, "some delineation would have to be made in the verdict forms to allow the jury to unanimously agree or disagree as to the individual counts that are

Case 2:14-cv-01414-JPS   Filed 03/30/16   Page 7 of 37   Document 30

alleged here." (*Id.* at 10:25–11:3). The Circuit Court pointed out that the first element of the offense required danger to the safety of another human being—requiring more than generic endangerment of the public. (*Id.* at 11:4–15).

Nonetheless, the Circuit Court found probable cause for two of the three reckless endangerment charges. (*Id.* at 11:16–12:12, 13:14–14:16). It noted that one of the charges could rest on Mr. Haizel's allegedly having shot at Deputy Stolz, but had difficulty identifying conduct upon which the other two charges could rest. (*Id.* at 11:16–12:12). The district attorney supplied possible bases: first, that Deputy Killey observed a muzzle flash and there were gunshots fired in his vicinity; and, second, several shots came out of the west wall where police officers had been stationed. (*Id.* at 12:13–24). The Circuit Court found the first rationale persuasive and—at least for the purpose of the preliminary hearing—agreed that it supplied probable cause for the second reckless endangerment charge. (*Id.* at 13:14–14:16). But the Circuit Court could not find probable cause for the third charge and, therefore, dismissed it. (*Id.* at 14:17–20).

So, following this hearing, Mr. Haizel faced one less reckless endangerment charge. The district attorney planned to file an information soon after and Mr. Haizel preserved his right to raise an argument based upon multiplicity/duplicity in the information. (*See, e.g.*, *id.* at 15:4–11, 16:8–13, 18:5–8).

### 1.2.4   Information Against Mr. Haizel

Following the preliminary hearing, the district attorney filed an information against Mr. Haizel. (Docket #17, Ex. 5). That information is very similar to the complaint. (*Compare* Docket #17, Ex. 5 *with* Docket #17, Ex. 9). The most notable difference between the two documents is that the

information noted that Count 4 had been dismissed by the Circuit Court. (*See* Docket #17, Ex. 5 at 2).

### 1.2.5 Mr. Haizel's Second Motion to Dismiss Certain Charges

On May 7, 2010 (four days after the preliminary hearing), Mr. Haizel filed a second motion to dismiss. (Docket #17, Ex. 3). This time, he argued that the attempted homicide charge (Count 1) and one of the reckless endangerment charges (Count 2) were multiplicitous. (*See id.* at 1) The basis for this argument was the Circuit Court having found at the preliminary hearing that one of the reckless endangerment charges must be based upon Mr. Haizel's allegedly having shot at Deputy Stolz. (*See id.*) The same conduct formed the basis for the attempted homicide charge and, therefore, according to Mr. Haizel, that reckless endangerment charge could be charged only as a lesser included offense of the attempted homicide charge. (*Id.* at 2) (citing *State v. Cox*, 300 Wis. 2d 236, 730 N.W.2d 452 (Ct. App. 2007)).

### 1.2.6 Hearing on Mr. Haizel's Second Motion to Dismiss

On June 14, 2010, the Circuit Court held a hearing to address Mr. Haizel's second motion to dismiss. (Docket #17, Ex. 4). At that hearing, the district attorney conceded the general point that Mr. Haizel made in his second motion to dismiss (specifically, that Mr. Haizel's allegedly firing a gun at Deputy Stolz could not form the basis for separate charges of attempted homicide and reckless endangerment). (*Id.* at 3:11–16). The Circuit Court attempted to clarify this concession: "Count 1 [the attempted homicide charge] only relates…to Deputy Stolz; Count 2 [a reckless endangerment charge], if I understand everything, doesn't arise from conduct directed at Deputy Stolz. Correct?" (*Id.* at 3:21–24). The district attorney generally agreed with the Circuit Court's assessment, but with a caveat: "Our theory for

attempted first degree intentional homicide was when [Mr. Haizel] was outside and fired the shot directly at Deputy Stolz, and Deputy Stolz returned fire. Prior to that there were multiple shots that were fired at the scene, and there were multiple law enforcement officers that were present on scene, including Deputy Stolz." (*Id.* at 4:5–13). In sum, between the preliminary hearing and this hearing, the district attorney shifted his theory for Count 2. (*See id.*) At the preliminary hearing, the district attorney seemed to have asserted that Mr. Haizel was charged with reckless endangerment in Count 2 for having fired at Deputy Stolz after leaving his house; at this second hearing, he argued that Count 2 was based upon "the earlier shots." (*Id.* at 4:14–16). That shift allowed the district attorney to avoid the multiplicity problem that Mr. Haizel raised in his second motion to dismiss.

But it brought back up the issue of specificity that Mr. Haizel had raised during the preliminary hearing, and he renewed his objection to Count 2 on that basis. (*Id.* at 5:2–7).

Again, the district attorney shifted from his earlier theory of the reckless endangerment charges. He now maintained that the (at least) two incidents of Mr. Haizel shooting his gun from within his house would support each of the two remaining reckless endangerment charges. (*Id.* at 6:6–7:13). Specifically, the district attorney argued that: (1) Mr. Haizel's 19 rapid shots—which followed five minutes after his first shot—supported Count 2; and (2) Mr. Haizel's remaining shots—the 12 shots that followed approximately two minutes after the 19 rapid shots—supported Count 3. (*Id.* at 6:6–7:13; 8:16–17).

This prompted the Circuit Court to refocus its analysis: it accepted that there were two separate instances of multiple shots being fired, but

questioned whether anyone was in danger during either instance. (*Id.* at 8:18–9:11). The Circuit Court explained its concern:

> My question is, in the charge of first degree reckless endangerment the State has to prove that somebody was in danger, don't they? Isn't that really what, factually, separates out any particular counts? That's the problem I am having.
>
> For instance, if he knows that officers are standing at the front door and wants him to come out and he turns around and fires 19 shots out the back door, the officer standing in front was never in danger. Do you think that that still constitutes first degree reckless endangerment if nobody is in proximity to where the shots are being fired?

(*Id.* at 8:25–9:11).

The district attorney did not concede that point, but noted that even if the Circuit Court's analysis was correct, there were much different circumstances in this case. (*Id.* at 9:12–22). The district attorney pointed out that, in this case, law enforcement officers had surrounded Mr. Haizel's house at the time when Mr. Haizel fired shots in multiple different directions from his house. (*Id.*)

That argument did not alleviate the Circuit Court's concerns. The Circuit Court came back to its previous point:

> But I mean, I will go back to my same analogy that if the house is surrounded by police officers except for one area that they overlooked, and all the shots are fired in that area, nobody is in danger. You can fire a hundred shots to a place where nobody is and nobody is actually in danger. In order for you to get a conviction of one or more of these counts, it seems to me you have to identify the person, or persons, you are alleging were in danger in each of these counts, as opposed to the number of shots or whether you can separate the shots out.

(*Id.* at 10:6–17).

The district attorney responded by pointing out that the jury instruction requires only danger "to another person." (*Id.* at 11:7–9). And, because "the defendant knew that his house was surrounded by law enforcement," and "on multiple occasions…shot in multiple directions," he certainly endangered another person. (*Id.* at 11:25–12:4).

Again, this did not entirely alleviate the Circuit Court's concerns. (*See id.* at 13:22–14:15). The Circuit Court remained concerned about the possibility that "for some reason some of these shots are determined to have been shot through the roof or someplace where nobody is actually endangered, then you come back and say, well, we didn't mean that one we meant a different one." (*Id.* at 14:5–9).

Nonetheless, the Circuit Court did not dismiss the reckless endangerment counts, acknowledging that the issues it identified were better directed to the jury. (*See id.* at 13:22–17:15). Accordingly, the Circuit Court denied Mr. Haizel's second motion to dismiss and arraigned Mr. Haizel on the four charges in the information. (*Id.* at 17:19–18:23).

### 1.3    Plea Agreement and Hearing

The next event for which this Court has a record is Mr. Haizel's October 27, 2010 plea hearing. (Docket #8, Ex. 8).

At that hearing, the parties agreed that Mr. Haizel would plead guilty to Counts 2 and 3 (the reckless endangerment charges) in exchange for dismissal of Counts 1 and 5 (the attempted homicide and intentional point firearm charges, respectively). (*Id.* at 2:25–3:4).[6] The district attorney retained the ability to "read in" Counts 1 and 5. (*Id.*) Meanwhile, Mr. Haizel was free to argue whatever sentence he would like at sentencing, but the district

---

[6]Mr. Haizel appeared with Attorney Gerald Boyle at his plea hearing.

attorney was constrained to recommending concurrent sentences on Counts 2 and 3. (*Id.* at 3:20–4:2). During the plea hearing, there was some question about whether the district attorney might agree to drop the firearm enhancement applicable to Counts 2 and 3, but ultimately the district attorney declined to do that. (*See id.* at 4:2–5:18, 6:1–8). Despite that fact, Mr. Haizel still decided to plead guilty to Counts 2 and 3. (*See id.* at 6:1–8).

The Circuit Court began its plea colloquy by asking whether Mr. Haizel wished to plead guilty to Counts 2 and 3 in exchange for Counts 1 and 5 being dismissed but read-in. (*Id.* at 6:13–7:6). Mr. Haizel did not understand what it meant for Counts 1 and 5 to be "read in." (*Id.* at 7:7–9). So, the Circuit Court explained that it could consider the read-in charges, but could not separately sentence Mr. Haizel on those charges. (*Id.* at 7:10–8:3). With that understanding, Mr. Haizel confirmed that he was fine with proceeding. (*Id.* at 8:4–9:7).

The Circuit Court then explained that, because Mr. Haizel was pleading guilty to Counts 2 and 3, he faced a maximum of 35 years of imprisonment. (*Id.* at 11:4–8). The Circuit Court stated very clearly that Mr. Haizel faced that sentence because "even though the State's going to recommend concurrent time…I wouldn't have to go along with concurrent time if I felt something different was appropriate." (*Id.* at 11:9–15). Mr. Haizel stated that he understood. (*Id.* at 11:16).

Next, the Circuit Court walked Mr. Haizel through a plea questionnaire, questioning him about his background and clarifying that he understood he was giving up multiple constitutional rights. (*Id.* at 11:20–14:22).

Most importantly, the Circuit Court engaged in a lengthy discussion with Mr. Haizel about the nature of his actions:[7]

> THE COURT: And do you understand for the charge of reckless endangering safety there are three different things, they're called elements, but three different things the State would have to prove to get a conviction for a charge of recklessly endangering safety? Do you understand that?
>
> THE DEFENDANT: Yes, Sir.
>
> THE COURT: Just to go through that with you, the State would have to prove, first of all, that you endangered the safety of another human being, understand?
>
> THE DEFENDANT: Yes, Sir.
>
> THE COURT: Okay, and do you agree that your conduct on March 20th, 2010, endangered the safety of another human being; actually, that it did so on at least two different occasions during the course of events that occurred on March 20th, 2010?
>
> THE DEFENDANT: Yes, Sir.
>
> THE COURT: Now, the second element that the State would have to prove is that your conduct endangered another person's safety by what is called criminally reckless conduct. Do you understand the State would have to prove that as well?
>
> THE DEFENDANT: Yes, Sir.
>
> THE COURT: And are you agreeing that your conduct on March 20th, 2010, was criminally reckless conduct?
>
> THE DEFENDANT: Yes, Sir.
>
> THE COURT: Okay, and the State would also have to prove that the circumstances of your conduct showed utter disregard for human life. Do you understand, first of all, that's the third element the State would have to prove?

---

[7] The Court reproduces the same portions of the plea transcript as the respondent. The Court agrees that these are the most relevant portions of the hearing. And, while it is a substantial amount of material, it is ultimately important to the outcome of this case.

Case 2:14-cv-01414-JPS   Filed 03/30/16   Page 14 of 37   Document 30

THE DEFENDANT: Yes, Sir.

THE COURT: And do you agree that your conduct on March 20th, 2010, did show utter disregard for human life?

THE DEFENDANT: Yes, Sir.

THE COURT: And because these charges also have this enhancer -- so-called enhancer about using a dangerous weapon, do you understand the State would also have to prove for each of these charges that you did, in fact, use a dangerous weapon, understood?

THE DEFENDANT: Yes, Sir.

THE COURT: And are you agreeing, in fact, that you did use a dangerous weapon while you were recklessly endangering the safety of another human being?

THE DEFENDANT: Yes, Sir.

THE COURT: Okay, so in entering your pleas of guilty to Count 2 and Count 3, are you agreeing that the State could prove all of those things?

THE DEFENDANT: Yes, Sir.

THE COURT: All right. And let me go back to asking you what your memory was of the events of March 20th, 2010. You did indicate you recall having this SKS rifle, right?

THE DEFENDANT: Yes.

THE COURT: And you recall discharging it?

THE DEFENDANT: Yes.

THE COURT: Okay. At least according to the complaint it happened many times. I didn't count them all. Mr. Boyle, what was your count?

MR. BOYLE: I count 33, Judge.

THE COURT: Okay, and I don't care whether it's exactly 33 or not, Mr. Haizel. That's not the point but you agree you discharged that SKS rifle a number of times?

THE DEFENDANT: Yes, Sir.

THE COURT: Okay, and do you remember that there were officers called to the house on March 20th, 2010?

THE DEFENDANT: Yes, Sir.

THE COURT: And do you recall the officers asking you to surrender?

THE DEFENDANT: No, Sir.

THE COURT: Or put down the weapon you had?

THE DEFENDANT: No, Sir.

THE COURT: Okay, you don't remember that. Do you remember discharging that SKS rifle while the officers were present?

THE DEFENDANT: Yes.

THE COURT: Do you remember having the rifle pointed, at least generally, in the direction of law enforcement officers?

MR. BOYLE: Judge, if I might?

THE COURT: Sure.

MR. BOYLE: He was inside the house. The officers were outside the house.

THE COURT: All right. And part of it I think he was also outside --

MR. BOYLE: Yes.

THE COURT: -- the house but it went through the window.

MR. BOYLE: Therefore, he has memory of certainly inside the house firing. When we get into firing it outside the house, his memory is not as -- as understood by him. So, therefore, it really didn't make a difference to me in advising him, as long as the elements were present at some time during this fiasco, and I just wanted to bring that to your attention so you understand it.

THE COURT: Sure. Mr. Haizel, is that the case? That your memory of what happened inside the house is better than what happened outside the house?

THE DEFENDANT: Yes, it certainly is. I don't believe I did any shooting outside the house.

THE COURT: Okay. But you did the shooting with the rifle from inside the house?

THE DEFENDANT: Yes, Sir.

THE COURT: And again, we don't know for sure. I'm not saying it's important to know the exact number of times but do you know approximately how many times you shot the rifle?

THE DEFENDANT: I only recall shooting the rifle once or twice, but I certainly don't deny that I did more.

THE COURT: All right. You understand, if in fact it was only once, that wouldn't support two charges of first degree reckless endangerment, using a dangerous weapon if you only used it once?

THE DEFENDANT: I've read through everything and looked at the pictures. I'm pretty comfortable admitting to two counts.

THE COURT: All right. And in admitting to two counts do you believe that you are guilty of at least -- of those two counts?

THE DEFENDANT: Yes, Sir.

THE COURT: And that you fired that rifle on more than one occasion from inside the house to outside the house, right?

THE DEFENDANT: Yes, Sir.

THE COURT: And do you admit to doing that at a point in time when you knew law enforcement officers were on the scene outside the house?

THE DEFENDANT: Yes, Sir.

THE COURT: And do you admit that, at least generally speaking and I'm not saying you fired it at the officers, that's not what I'm suggesting, but that you fired it in the general vicinity of where law enforcement officers were outside the house?

THE DEFENDANT: Yes, Sir.

> THE COURT: All right. You did that on at least two occasions?
>
> THE DEFENDANT: Yes, Sir.

(*Id.* at 22:25–28:18). Mr. Haizel also acknowledged that he had met with his attorneys on numerous occasions and was satisfied with their counsel. (*Id.* at 29:21–30:24).

After all of those discussions, the Circuit Court accepted Mr. Haizel's plea, finding a factual basis for it and that Mr. Haizel was competent to enter the plea. (*Id.* at 30:25–31:24). The Circuit Court closed by ordering a presentence report and setting a sentencing hearing for approximately two months later. (*Id.* at 31:20–32:14).

### 1.4    Presentence Report

A probation officer prepared a presentence report regarding Mr. Haizel and his offenses, and filed that report on December 1, 2010. (*See* Docket #19). That document is sealed because it contains very sensitive information, most of which is irrelevant to Mr. Haizel's claims (and which the Court, therefore, does not need to discuss). The Court discusses the presentence report only to point out a significant point of disagreement between Mr. Haizel and the deputies who were present on the scene.

Mr. Haizel's Version of Events. Mr. Haizel maintained that, because he was so intoxicated, he did not remember large portions of the incident. (Docket #19 at 5–6). He stated that he did not remember firing many of the shots from within his house. (*Id.* at 6). Perhaps more importantly, he also stated that he did not recall shooting at Deputy Stolz once outside and "also question[ed] whether he actually fired a shot at the deputy because he said no shell casings were found indicating that he did so, and said the damage that was allegedly done to the tree by a bullet fired by him was actually damage that was very old. (*Id.*)

Deputy Killey's and Deputy Stolz's Versions of Events. Deputy Killey and Deputy Stolz—both of whom were on scene and allegedly fired on by Mr. Haizel—understandably reported a much different version of events. (*Id.* at 7–10). Deputy Killey, for instance, voiced a concern that Mr. Haizel was specifically attempting to kill police officers. (*See id.* at 7–8). Deputy Killey believed that Mr. Haizel's first single shot was intended to convince the deputies that he had committed suicide, drawing the deputies inside. (*Id.*). That belief was borne out by the facts that: (1) Mr. Haizel's next series of rapid fire shots went into a wall on the other side of a hallway that the deputies would have used to enter the residence; (2) the ammunition Mr. Haizel used was "full-metal jacketed" and could have penetrated the officers' body armor; and (3) Mr. Haizel had positioned a mirror so that he could see whether any deputies were approaching his position in the house. (*Id.*) Deputy Killey further argued that, while Mr. Haizel might have been drunk, all of his actions were purposeful and methodical—almost as if he were "hunting" or carrying out a "pre-rehearsed fantasy." (*Id.*) Deputy Stolz agreed with Deputy Killey's assessment. (*Id.* at 8–10). Deputy Stolz also maintained that Mr. Haizel had fired on him. (*Id.* at 9). And, even after Deputy Stolz had shot Mr. Haizel, Mr. Haizel allegedly refused to drop his gun for several moments during a tense stand-off. (*Id.* at 9–10).

### 1.5     Sentencing Hearing

After having reviewed the presentence report,[8] the Circuit Court held its sentencing hearing on January 25, 2011. (Docket #8, Ex. 9).

---

[8]The Circuit Court also reviewed 14 letters from victims (including deputies and their family members) and Mr. Haizel's family. (Docket #8, Ex. 9 at 2:18–25). Those letters are not in the record in this habeas proceeding.

The sentencing hearing began with statements from various individuals on Mr. Haizel's behalf, including his co-workers, mother, and neighbor. (*Id.* at 5:20–12:22). Each person described Mr. Haizel very positively and stated his or her belief that Mr. Haizel's actions were the result of his intoxication, alone. (*Id.*)

The district attorney then provided the state's position, highlighting the very dangerous nature of the offense. (*Id.* at 13:3–28:16). The district attorney called the matter "one of the most serious law enforcement cases that we've seen in Washington County in the last several years." (*Id.* at 22:22–24). Accordingly, the district attorney believed that a prison sentence would be necessary, and a lengthy one: 7 years and 6 months imprisonment followed by 5 years of extended supervision on both reckless endangerment counts, to run concurrent with one another.[9] (*E.g., id.* at 25:11–13, 27:9–13).

The probation officer who wrote the presentence report then suggested a total of 14 years of imprisonment (7 years on each count to run consecutive to each other). (*Id.* at 29:6–25). In support, he pointed out that this situation was one of the most dangerous he had ever seen in his time in Washington County, as it involved a serious threat to the safety of everyone involved. (*Id.* at 29:11–25).

Mr. Haizel's attorneys then made statements on the defendant's behalf. (*Id.* at 30:3–53:20). Ms. Boyle went first and led off by criticizing the argument that Mr. Haizel was attempting to ambush the deputies. (*Id.* at 33:13–35:16). She argued that alcohol was the driving factor, and that Mr. Haizel made a one-time mistake with disastrous consequences. (*Id.* at

---

[9]The plea agreement required the district attorney to recommend a concurrent sentence.

Case 2:14-cv-01414-JPS    Filed 03/30/16    Page 20 of 37    Document 30

35:17–38:5). She then addressed the attempted homicide charge that Mr. Haizel originally faced, arguing that Mr. Haizel actually had never fired at Deputy Stolz; in support, she pointed out that law enforcement officers never found a shell casing from Mr. Haizel's gun and that a tree that was allegedly hit by Mr. Haizel's bullet had been damaged before the incident. (*Id.* at 39:6–39:18). She concluded by speaking positively about Mr. Haizel, as a person, and explaining why he had several guns and large amounts of ammunition. (*Id.* at 39:19–43:11). Mr. Boyle followed and provided support for Mr. Haizel's character. (*Id.* at 43:12–53:20). In sum, they requested either a probationary sentence or a sentence with no more than 5 years of imprisonment. (*See id.* at 30:3–53:20).

Mr. Haizel then made a statement on his own behalf, apologizing for his actions and ascribing his conduct primarily to his intoxication. (*Id.* at 54:3–57:19).

The Circuit Court then provided a lengthy discussion about the facts and sentencing factors. (*Id.* at 57:23–87:12). The Circuit Court first found it unlikely that Mr. Haizel's first shot was fired as an attempt to draw deputies inside. (*Id.* at 59:5–60:22). Likewise, the Circuit Court found that Mr. Haizel's mirror had been located where it was prior to the incident; in other words, Mr. Haizel did not place it there in order to ambush police officers. (*Id.* at 60:23–61:14). The Circuit Court also discounted the importance of the number of guns and ammunition that were in the house, finding that he had a right to those items and likely kept them for hunting purposes. (*Id.* at 61:15–62:25). The Circuit Court did, however, find it likely that Mr. Haizel fired at Deputy Stolz. (*Id.* at 63:15–64:20). Next, the Circuit Court noted its serious concerns with the moral aspects of Mr. Haizel's actions: Mr. Haizel had been drinking for a long time before the incident, during which time he started to get out

of control; Mr. Haizel had previously been convicted of operating a firearm while under the influence; Mr. Haizel used armor-piercing bullets that would have "gone through a vest if an officer had the misfortune of being struck by one of those 31 shots, whether it was direct or on a ricochet"; and, Mr. Haizel fired at both Deputy Killey and Deputy Stolz. (*Id.* at 65:10–69:6). The Circuit Court pointed out that '[e]verybody was in the line of fire," and that, although it only mentioned 3 deputies by name, the remaining deputies on scene were all in danger. (*Id.* at 69:7–14). Thus, while Mr. Haizel's intoxication did, in some ways, diminish his moral culpability, the Circuit Court still had serious concerns. (*Id.* at 69:15–71:18). After applying the sentencing factors to those facts and Mr. Haizel's personal history, the Circuit Court imposed a sentence of 8 years of imprisonment and 5 years of extended supervision as to each count, to run consecutive to one another, for a total sentence of 16 years of imprisonment and 10 years of extended supervision.[10] (*Id.* at 71:19–87:12).

---

[10]Of note to Mr. Haizel's habeas petition is the fact that the Circuit Court had the following to say about Mr. Haizel's attorneys:

> Your lawyers have done, in my opinion, a tremendous job of negotiating a deal for you that is extremely favorable. They have. And there are some good reasons, I understand, as to why that happened and why the State agreed to it but I do need to say that regardless of the sentence I'm going to give you, in my opinion, your lawyers have done a fantastic job on your behalf.
>
> Whether you will understand or appreciate that, I don't know, but -- and I'm not saying that to flatter Mr. Boyle or Ms. Boyle. I'm saying it because I think it's absolutely accurate. They have put together something that prevents me from sentencing you on attempt first degree intentional homicide. Who knows what a jury might have done with that, but that's not what I'm here to decide. I'm just here to consider it as a read-in and I do.

(Docket #8, Ex. 9 at 84:16–85:17).

The Circuit Court entered judgment against Mr. Haizel the same day. (Docket #8, Ex. 1).

### 1.6 Post-Conviction Motions and Consultant Reports

Following sentencing, Mr. Haizel filed two post-conviction motions, both seeking leave to withdraw his plea. *See Haizel*, 2013 WI App 138 ¶ 5. In the first, he asserted that his plea counsel had been ineffective. *Id.* In the second, he asserted that there was newly discovered evidence that undermined his plea. *Id.* The alleged newly discovered evidence was made up of two reports from a firearms consultant, prepared more than 6 months after Mr. Haizel's sentencing and based upon observations from much more than a year after the incident took place. *See id.* (*See also* Docket #8, Ex. 2, App. 9–12).

The first report related to the reckless endangerment charges; it recounted that the consultant had examined three holes on the south exterior of Mr. Haizel's home and damage to a window frame. (*See* Docket #8, Ex. 2, App. 9–10). With respect to the three exterior holes, the consultant concluded only that "no projectiles [coming from those holes] would have impacted the adjacent residence." (*Id.* at 10). With respect to the window frame damage, the consultant concluded that "[l]ine of sight projection indicated that a projectile (providing it retained enough energy [after passing through the window frame]) would have passed very close to the southwest corner of the [adjacent] residence…but would not have impacted the building." (*Id.*)

The second report related to the attempted homicide charge; it recounted that there was no spent cartridge from Mr. Haizel's gun either within the gun itself or anywhere nearby, thus allegedly showing that Mr. Haizel did not fire his gun at Deputy Stolz. (*Id.* at 11–12). The consultant concluded that his analysis "provides more then [*sic*] a reasonable doubt that

the questioned firearm was not fired in or around the location from which it was recovered." (*Id.* at 12).

The Circuit Court denied both of Mr. Haizel's post-trial motions. *Haizel*, 2013 WI App 138 ¶ 5.

### 1.7 Direct Appeal

Mr. Haizel next appealed, challenging the denial of his post-trial motions and also his sentence, which he contended was based upon information later proved incorrect by the consultant's reports. *Id.* ¶ 6.

The Wisconsin Court of Appeals ("the Court of Appeals") rejected each of those arguments. *Id.* ¶¶ 8–24. Specifically, it held that: (1) there was clearly a factual basis for Mr. Haizel's convictions on the reckless endangerment charges, *id.* ¶ 13; (2) Mr. Haizel's counsel was not ineffective, either for failing to investigate the alleged lack of a factual basis for the attempted homicide charge or for failing to object to the alleged lack of a factual basis for the reckless endangerment charge, *id.* ¶¶ 17–19; (3) the consultant's reports did not provide a basis for plea withdrawal, *id.* ¶ 21; and, (4) the consultant's reports did not establish that Mr. Haizel had been sentenced upon inaccurate information, *id.* ¶ 24. For all of these reasons, the Court of Appeals affirmed the Mr. Haizel's convictions and sentence, together with the Circuit Court's denial of his post-trial motions. *Id.*

Mr. Haizel filed a petition for review with the Wisconsin Supreme Court ("the Supreme Court"), asserting the same issues (Docket #8, Ex. 6), but the Supreme Court denied that petition (Docket #8, Ex. 7).

### 1.8 Federal Habeas Proceedings

Having gone through his entire state direct appeal without relief, Mr. Haizel next filed the federal habeas petition that is now before the Court.

(Docket #1). Mr. Haizel raises the same claims that he raised before the state courts:

    (1)    that his plea was not voluntary, knowing, and intelligent because there was not actually a factual basis to support it;

    (2)    that his plea counsel was ineffective in…

        (a)    failing to further investigate whether Mr. Haizel fired a gun at Deputy Stolz while outside; and

        (b)    failing to object to the alleged lack of factual basis for the reckless endangerment claims; and

    (3)    that the sentencing court relied on inaccurate information—specifically, his allegedly having shot at Deputy Stolz—when sentencing him.

(*See, e.g.*, Docket #25, #29). After several expansions of the record (*see, e.g.*, Docket #17, #19, #22), the parties fully briefed Mr. Haizel's petition (Docket #25, #28, #29). The matter is now before the Court for resolution.

2.    ANALYSIS

    The Court begins its analysis by providing the legal standards generally applicable to habeas cases. It then substantively analyzes each of Mr. Haizel's claims, providing further information about the applicable standards as relevant to each of those claims.

    2.1    General Legal Standards Applicable in Habeas Cases

    For those claims which the state courts addressed on their merits, the Court may grant a writ of habeas corpus only if the state court's decision was: (1) "contrary to…clearly established federal law, as determined by the Supreme Court of the United States"; (2) "involved an unreasonable application of[] clearly established Federal law, as determined by the Supreme Court of the United States"; or (3) "was based on an unreasonable determination of the facts in light of the evidence presented in the state court

proceeding." 28 U.S.C. § 2254(d)(l-2). *See also Caffey v. Butler*, 802 F.3d 884, 894 (7th Cir. 2015).

"A state court decision is contrary to clearly established federal law if the court applies a rule that plainly contradicts the Supreme Court's governing rule or if it comes to a result different than did the Supreme Court on substantially identical facts." *Avila v. Richardson*, 751 F.3d 534, 536 (7th Cir. 2014) (citing *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000)). *See also Caffey*, 802 F.3d at 894 (citing *Greene v. Fisher*, --- U.S. ----, 132 S.Ct. 38, 44 (2011); *Williams v. Taylor*, 529 U.S. 362, 412 (2000)); *Kamlager v. Pollard*, 715 F.3d 1010, 1016 (7th Cir. 2013) (citing *Bell v. Cone*, 535 U.S. 685, 694 (2002); *Williams*, 529 U.S. at 405-06; *McNary v. Lemke*, 708 F.3d 905, 913 (7th Cir. 2013)).

"A decision involves an 'unreasonable application' of Supreme Court precedent if the decision, while identifying the correct governing rule of law, applies it unreasonably to the facts of the case." *Bailey v. Lemke*, 735 F.3d 945, 949 (7th Cir. 2013) (citing *Williams*, 529 U.S. at 407). However, the Supreme Court has made clear that "an unreasonable application of federal law is different from an incorrect application of federal law." *Williams*, 529 U.S. at 410. "Mere error is not enough to overcome AEDPA deference; instead, the state court's decision must be objectively unreasonable, meaning it is 'beyond any possibility for fairminded disagreement.'" *Caffey*, 802 F.3d at 894 (quoting *Mosley v. Atchison*, 689 F.3d 838, 844 (7th Cir. 2012); citing *Harrington v. Richter*, 562 U.S. 86, 103 (2011); *Etherly v. Davis*, 619 F.3d 654, 660 (7th Cir. 2010)).

"A decision 'involves an unreasonable determination of the facts if it rests upon fact-finding that ignores the clear and convincing weight of the evidence.'" *Bailey v. Lemke*, 735 F.3d 945, 949–50 (7th Cir. 2013) (quoting

*Goudy v. Basinger*, 604 F.3d 394, 399–400 (7th Cir. 2010); citing *Ward v. Sternes*, 334 F.3d 696 (7th Cir. 2003)).

## 2.2 Lack of Factual Basis for Mr. Haizel's Plea/Conviction

Mr. Haizel's first claim is that his plea to the reckless endangerment charges was not voluntary, knowing, and intelligent because there was no factual basis to support that anyone was endangered. (*See, e.g.*, Docket #29 at 1). In essence, Mr. Haizel is claiming that the consultant's reports show that no person was ever *actually* endangered by the shots he fired. (*See, e.g.*, Docket #29 at 2–3). The respondent (hereinafter, "the State") disagrees, arguing that Mr. Haizel's claim does not arise under federal law[11] and, in the alternative, that he entered his pleas voluntarily, knowingly, and intelligently. (Docket #28 at 6–16).

Several years ago, in *Warren*, the Seventh Circuit considered a situation almost identical to Mr. Haizel's. *See* 712 F.3d at 1102–03. In that case, the Seventh Circuit began by discussing the standard applicable to a plea challenge:

> To survive a due process challenge, a plea must be knowing, voluntary, and intelligently entered. [*Perruquet v. Briley*, 390 F.3d 505, 519 (7th Cir. 2004).] The defendant bears the burden

---

[11]While this may be a valid point, the substantive analysis would remain largely the same, whether Mr. Haizel was challenging his plea under federal or state standards. *See Warren v. Baenen*, 712 F.3d 1090, 1102 (7th Cir. 2013) ("To be sure, the Wisconsin standard that a plea must be knowingly, intelligently, and voluntarily entered is the same as the constitutional due process standard.") (citing Wis. Stat. § 971.08; *Parke v. Raley*, 506 U.S. 20, 28–29 (1992)). And because Mr. Haizel's plea clearly satisfies those standards, the Court finds it better to address the claim on its substance. In any event, that may be the only way that Mr. Haizel can actually get the claim before this Court: "a defendant who pleads guilty upon the advice of counsel may only attack the voluntary and intelligent character of the guilty plea by showing that the advice he received" was constitutionally ineffective. *Hill v. Lockhart*, 474 U.S. 52, 56 (1985) (internal citations omitted).

Case 2:14-cv-01414-JPS   Filed 03/30/16   Page 27 of 37   Document 30

of proving that a plea did not meet those requirements. *Virsnieks v. Smith*, 521 F.3d 707, 714–15 (7th Cir. 2008). Generally, "pleas are accorded a great measure of finality because they are important components of this country's criminal justice system." *Id.* at 714 (internal quotation marks omitted). To determine whether a plea was knowing and voluntary, a court must look at "all of the relevant circumstances surrounding it." *Id.* "To enter a voluntary and intelligent plea, a defendant must have full awareness of the plea's direct consequences, real notice of the true nature of the charge against him, and understand the law in relation to the facts." *Id.* (internal quotation marks and citations omitted). "However, lawyers need not inform their clients of every possible defense, argument, or tactic, especially one not suggested by any evidence at the time." *St. Pierre v. Walls*, 297 F.3d 617, 635 (7th Cir. 2002) (emphasis omitted).

*Warren*, 712 F.3d at 1102. The petitioner in that case, Warren, challenged the effectiveness of his counsel,[12] arguing that his plea was unknowing because: (1) he did not know that he could pursue a self-defense claim at his intentional homicide trial; (2) that he did not know of allegedly-exculpatory witnesses who might support his self-defense claim; and (3) that he did not know that the basis of the homicide charge was, in fact, wrong. *Id.* In the portion of its analysis most relevant to Mr. Haizel's claim, the Seventh Circuit rejected the latter two of those arguments. *Id.* at 1103. It first held that the allegedly-exculpatory witnesses would not actually have supported Warren's self-defense claim. *Id.* It then held that Warren, in fact, knew of the facts upon which the intentional homicide charge was based, thus preventing him from later arguing that he lacked that knowledge. *Id.*

---

[12]In this way, Warren differed slightly from Mr. Haizel's situation. Unlike Warren, Mr. Haizel is presenting this as a stand-alone claim, rather than through the "lens" of effectiveness of counsel. Even taking that difference into account, though, the *Warren* case's many similarities make it very persuasive.

The Court begins by pointing out that the consultant's first report—like the allegedly-exculpatory witnesses in *Warren*—does not *actually* undermine the factual basis for Mr. Haizel's plea. All that the consultant's first report says is that *some*[13] of Mr. Haizel's shots did not go in the direction *of the neighbor's house*. Even assuming that to be true,[14] it does not account for *all* of the shots or that the stated factual basis for Mr. Haizel's reckless endangerment pleas was his firing his rifle from inside of his house to the outside while deputies surrounded his house. *See* pages 17–18, *supra* (reproducing plea colloquy). So, regardless of whether any bullets went towards the neighbor's house (and, again, the report does not actually even rule that out), they still almost certainly went somewhere near the deputies.[15]

---

[13]The Court says "some," because the report addresses only 4 total bullets with verifiable exit holes. But the Court cannot find any place where it addresses the possibility that shots exited the windows of the house (and there was no question that witnesses heard glass breaking).

[14]And this Court, for one, does not find the reports to be as rigorous as it might hope. With regard to the window-frame analysis, for instance, the consultant reach his conclusion based upon "[l]ine of sight projection," but did not explain precisely what that means. Does it mean that he simply looked out the hole from which the bullet traveled? Does it mean that he used a laser pointer or string to determine where the bullet would have gone if traveling in a straight line? Does it take into account other factors that might have affected the bullet's trajectory (*i.e.,* windspeed, the possibility that the bullet might have ricocheted off something)?

[15]Moreover, there was always the possibility of ricocheting the bullets. So even if Mr. Haizel was shooting in the opposite direction of the deputies (and there is nothing to suggest that he was), the Court would still find enough facts to support that the deputies were endangered as required for a reckless endangerment conviction. *See* Wis. Stat. § 941.30(1); Wis. JI-CRIMINAL 1345. The Court also notes that there is no requirement that the State prove the identity of any individual put in danger. *See, e.g.*, Wis. JI-CRIMINAL 1345. Mr. Haizel's contention that there was "no identifiable group" in danger is incorrect—the Circuit Court found that the deputies were endangered, and that is enough.

Case 2:14-cv-01414-JPS   Filed 03/30/16   Page 29 of 37   Document 30

This, alone, is enough to reject Mr. Haizel's argument that his plea was not knowing, voluntary, and intelligent.

But, even if the Court goes on to assume that the consultant's first report *is* somehow exculpatory, it does not contain any theory that Mr. Haizel did not know at the time of his plea. Mr. Haizel's theory is entirely undermined by his testimony at the plea colloquy: he stated that he could not remember shooting the gun from inside the house, but acknowledged that he did and that deputies surrounded his house at the time. *See* page 18, *supra*. At that point, he was certainly on notice that he could not be found guilty unless his shots went near someone—the Circuit Court, in fact, did a very impressive job of discussing the requirements for the reckless endangerment charges. *See* pages 16–18, *supra*. Mr. Haizel, in turn, accepted the facts that dictated his guilt: he fired multiple shots from inside the house while deputies surrounded his house.[16] Just as in *Warren*, the allegation that Mr. Haizel might not have been aware of the basis for the reckless endangerment charges is unsupported by the record. 712 F.3d at 1103. Accordingly, the Court rejects it.

In short, the plea colloquy was more than adequate, and this Court is entirely satisfied that Mr. Haizel knew both the legal basis for the reckless endangerment charges against him and the State's factual theory supporting

---

[16]This does not address counsel's failure to investigate, which the Court will discuss in the next section.

those charges; with that knowledge, he voluntarily and intelligently entered his pleas to the reckless endangerment charges.[17]

### 2.3    Ineffective Assistance of Plea Counsel

Mr. Haizel next claims that his attorneys at the time he pled guilty provided him ineffective assistance by: (1) failing to investigate the attempted homicide charge (by getting an expert report, for instance); and (2) failing to object to the factual basis for the reckless endangerment charges.

The Sixth Amendment right to effective assistance of counsel extends to the plea bargaining process. *Martin v. United States*, 789 F.3d 703, 706 (7th Cir. 2015) (citing *Lafler v. Cooper*, --- U.S. ----, 132 S.Ct. 1376, 1384 (2012)). This requires Mr. Haizel to satisfy the familiar two-part test articulated in *Strickland v. Washington*, 466 U.S. 668 (1984), requiring both deficient performance by counsel and prejudice to Mr. Haizel. When a habeas petitioner argues that plea counsel should have investigated further, he "must prove that evidence uncovered during that investigation would have led the attorney to change her recommendation to accept the plea offer." *Warren*, 712 F.3d at 1097 (citing *Hill v. Lockhart*, 474 U.S. 52, 59 (1985)); *see also Mulero v. Thompson*, 668 F.3d 529, 537 (7th Cir. 2012). "This is an objective analysis that requires us to examine what a reasonable person would do." *Richardson v. United States*, 379 F.3d 485, 488 (7th Cir. 2004) (*per curiam*) (citing *Hill*, 474 U.S. at 60). For example:

---

[17]The Wisconsin Court of Appeals appears to have limited its review on this issue to analyzing whether Mr. Haizel's plea satisfied the requirements of Wis. Stat. § 971.08(1)(b), *see Haizel*, 2013 WI App 138 ¶¶ 8–13. And, while that standard mirrors the requirements of constitutional due process, *see Warren*, 712 F.3d at 1102, the Court has nonetheless applied the most liberal *de novo* standard in assessing this claim, *see Cone v. Bell*, 556 U.S. 449, 472 (2009).

> [W]here the alleged error of counsel is a failure to investigate
> or discover potentially exculpatory evidence, the
> determination whether the error "prejudiced" the defendant
> by causing him to plead guilty rather than go to trial will
> depend on the likelihood that discovery of the evidence would
> have led counsel to change his recommendation as to the plea.
> *This assessment, in turn, will depend in large part on a prediction
> whether the evidence likely would have changed the outcome of a
> trial.*

*Hill*, 474 U.S. at 59 (emphasis added). Moreover, "[m]erely alleging 'that he would have insisted on going to trial' is inadequate" to show ineffectiveness of plea counsel. *Koons v. United States*, 639 F.3d 348, 351–52 (7th Cir. 2011) (quoting *Hutchings v. United States*, 618 F.3d 693, 697 (7th Cir. 2010)).

### 2.3.1    Failure to Investigate Attempted Homicide Charge

Applying those standards, it is clear that Mr. Haizel's ineffective-assistance claim is without merit, at least as it relates to his argument that plea counsel was ineffective in failing to investigate the factual basis underlying the attempted homicide charge.[18] In this regard, Mr. Haizel's argument is that plea counsel should have had a forensic investigation done. But, assuming that Mr. Haizel's plea counsel had obtained the consultant's second report—which says only that he found no shell casings (more than one year after the incident) and that no shell casings were in the gun—no reasonable attorney or defendant would have made any different suggestion to Mr. Haizel. Everyone was already aware that there was no shell casing recovered from Mr. Haizel's gun at the scene, so the consultant's second

---

[18]The Court of Appeals acknowledged the *Strickland* standard, but then applied the standard for plea withdrawal, at least to the first part of Mr. Haizel's ineffective-assistance argument. *See Haizel*, 2013 WI App 138 ¶¶ 16–17. To be on the safe side (and because it makes no difference to the outcome), the Court will therefore apply a *de novo* standard of review to this claim.

report effectively adds nothing to the analysis. At the time of the plea, a detective had already filed a report making clear that police officers had not found any shell casings from Mr. Haizel's handgun outside at the scene—potentially undermining the attempted murder charge. *See, e.g.*, *Haizel*, 2013 WI App 138 ¶¶ 3, 17. The consultant's second report does nothing more than reconfirm that there was not a shell casing in the gun. (*See* Docket #8, Ex. 2, App. 11–12). So, in the end, with or without the report, Mr. Haizel's defense to the attempted murder charge was in the same exact spot. He was still up against testimony from several deputies that would corroborate Deputy Stolz's assertion that Mr. Haizel fired on him. Meanwhile, Mr. Haizel alleged that he had no memory of this portion of the night, so he would not have been able to testify on this point (not to mention that he would be an extremely unsympathetic witness in front of any jury, given that he had fired more than 30 shots while his house was surrounded by 8 deputies). Simply stated, no reasonable attorney and no reasonable defendant would have chosen to go to trial on the attempted homicide charge—even with the consultant's second report. Plea counsel, therefore, was not ineffective. *See Hill*, 474 U.S. at 59–60.

The Seventh Circuit's decision in *Warren* again supports this Court's conclusion. In *Warren*, the Seventh Circuit discounted the import of statements of allegedly-exculpatory witnesses that the petitioner had discovered after pleading guilty and which he argued that plea counsel would have turned up if she had adequately investigated:

> There was nothing in the Washingtons' statements that would support Warren's self-defense claim. The description of a "struggle" in the car could have just as easily described the version of events presented by the prosecution. Indeed, all parties already agreed that some sort of struggle occurred in

Morrow's car; the Washingtons' statements did not add anything new to Warren's hypothetical defense. While one could imagine evidence that would have changed the plea calculus, the Washingtons' statements are not that evidence. On the basis of the Washingtons' statements it is profoundly unlikely that [plea counsel] would have changed her advice that Warren plead to first-degree reckless homicide—and that is the rub. *See Hill*, 474 U.S. at 59.

*Warren*, 712 F.3d at 1099. The second report, here, is like the Washingtons' statements in *Warren*: the second report added nothing new to Mr. Haizel's hypothetical defense.

### 2.3.2 Failure to Object to Factual Basis for Reckless Endangerment Charges

Counsel also was not ineffective in failing to object to the factual basis for the reckless endangerment charges. As the Court has already noted, there was (and still is) a solid factual basis for the reckless endangerment charges, so any objection would have been without merit, and Mr. Haizel would have suffered no prejudice. *See* Section 2.2, *supra*. Perhaps Mr. Haizel is arguing that plea counsel should have pursued a specificity objection and/or investigated further (*see* Docket # 25 at 20), but that argument also fails. As to the specificity objection, by the time the Circuit Court held its plea colloquy, the district attorney had cured the specificity concerns and—as already discussed—developed ample basis for the reckless endangerment charges. The failure to investigate argument, meanwhile, fails for the same reason as his investigation argument regarding the attempted homicide charge: the first report would not have convinced any reasonable attorney or person to go to trial. As the Court has already noted, there are substantial problems with that report, including that it may not address every shot that left Mr. Haizel's house nor accounted for the positions of the deputies. In

short, it "did not add anything new to [Mr. Haizel's] hypothetical defense," and so could not establish ineffective assistance. In short, the Court cannot conceive of any basis on which Mr. Haizel might prevail in challenging his plea on the basis of ineffective assistance.

### 2.4    Sentencing on Inaccurate Information

Mr. Haizel's final claim is that the Circuit Court's sentence improperly rested on an inaccurate finding that Mr. Haizel had fired at Deputy Stolz.

To be sure, criminal defendants have "the due process right to be sentenced on the basis of accurate information." *Ben-Yisrayl v. Buss*, 540 F.3d 542, 554 (7th Cir. 2008) (citing *Townsend v. Burke*, 334 U.S. 736 (1948); *United States v. Tucker*, 404 U.S. 443 (1972)).

But, in this case, the Circuit Court did not rely on inaccurate information. The Court of Appeals found—and this Court has already explained why it agrees—that the consultant's reports do not even come close to establishing that the Circuit Court relied on inaccurate information. As the Court has already detailed, those reports establish practically nothing. *See* Section 2.2., *supra*. The Court of Appeals' determination that the Circuit Court did not rely on inaccurate information is not clearly erroneous. Therefore, this claim fails.

### 3.    CONCLUSION

For all of the above reasons, the Court is obliged to deny Mr. Haizel's petition for a writ of habeas corpus.

Under Rule 11(a) of the Rules Governing Section 2254 Cases, "the district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." To obtain a certificate of appealability under 28 U.S.C. § 2253(c)(2), Mr. Haizel must make a "substantial showing of the denial of a constitutional right" by establishing that "reasonable jurists

could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003) (internal citations omitted). While Rule 11(a) permits a district court to direct the parties to submit arguments on whether a certificate of appealability should be issued, additional arguments are not necessary here. As the Court discussed extensively, above, reasonable jurists would not debate whether the petition should have been resolved in a different manner. No reasonable jurist would find it debatable that Mr. Haizel's petition fails to make any showing—let alone a substantial showing—of a violation of a constitutional right. As a consequence, the Court must deny a certificate of appealability as to Mr. Haizel's petition.

Next, the Court must address the two procedural motions that remain outstanding on the docket: Mr. Haizel's motions for enlargement of the state court record (Docket #22) and for leave to file excess pages (Docket #24). The Court has considered the subject of both of those motions and will, therefore, grant them.

Finally, the Court closes with some information about the actions that Mr. Haizel may take if he wishes to challenge the Court's resolution of this case. This order and the judgment to follow are final. A dissatisfied party may appeal this Court's decision to the Court of Appeals for the Seventh Circuit by filing in this Court a notice of appeal within 30 days of the entry of judgment. *See* Fed. R. App. P. 3, 4. This Court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. *See* Fed. R. App. P. 4(a)(5)(A). It should also be noted that because this court denied a certification of appealability, Mr. Haizel must seek one from the Seventh

Circuit. Fed. R. App. P. 22(b). Under certain circumstances, a party may ask this Court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Federal Rule of Civil Procedure 59(e) must be filed within 28 days of the entry of judgment. The Court cannot extend this deadline. *See* Fed. R. Civ. P. 6(b)(2). Any motion under Federal Rule of Civil Procedure 60(b) must be filed within a reasonable time, generally no more than one year after the entry of the judgment. The court cannot extend this deadline. See Federal Rule of Civil Procedure 6(b)(2). A party is expected to closely review all applicable rules and determine what, if any, further action is appropriate in a case.

Accordingly,

IT IS ORDERED that Mr. Haizel's petition for a writ of habeas corpus (Docket #1) be and the same is hereby DENIED;

IT IS FURTHER ORDERED that a certificate of appealability be and the same is hereby DENIED;

IT IS FURTHER ORDERED that Mr. Haizel's motions for enlargement of the state court record (Docket #22) and for leave to file excess pages (Docket #24) be and the same are hereby GRANTED; and

IT IS FURTHER ORDERED that this action be and the same is hereby DISMISSED with prejudice.

The Clerk of Court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 30th day of March, 2016.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge